UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD JOHNSTON,

        Plaintiff,

v.                                        Case Number 06-14905-BC
                                              Honorable Thomas L. Ludington

MID-MICHIGAN MEDICAL
CENTER-MIDLAND,

        Defendant.
_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On October 31, 2006, Plaintiff Ronald Johnston filed a complaint against Defendant Mid-Michigan Medical Center-Midland, alleging violations of the Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1101 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* On September 28, 2007, Defendant filed the instant motion for summary judgment under Federal Rule of Civil Procedure 56. On December 11, 2007, the Court held a hearing on this motion.

I.

Plaintiff previously worked as one of six biomedical technicians, maintaining and repairing medical equipment, for Defendant. Plaintiff is diabetic, and his manager, Rick Wood, knew of Plaintiff's condition.

On September 24, 2004, the manager corresponded with a nurse, who worked as Defendant's manager for Employee Health and Wellness Services, about Plaintiff's condition. The nurse expressed several medical concerns, stated that Plaintiff had some difficulty in 1995 or 1996, suggested sending Plaintiff for an evaluation, and noted that the situation could result in an ADA

issue. The manager responded that he believed that they had attempted to accommodate Plaintiff by allowing him to take breaks to eat and expressed concerns about Plaintiff's eyesight and the implication of him driving alone for work.

That same day, the manager also sent an e-mail to one of Defendant's human resources employees, inquiring about how to document the occurrence of diabetic episodes, since Plaintiff allegedly had one near that time. The response to the e-mail directed the manager to record the information in his "desk file," which was seen only by him. Plaintiff contends that a chart that his manager kept shows discriminatory animus against him, based on his diabetic condition. The chart, at Pl. Rs. Br., Ex. 4 [dkt #19-5], entitled "Ron Johnston's Performance Concerns," does note that Plaintiff appeared incoherent and slow to respond on several occasions. Only once does the chart refer to diabetes, when Plaintiff explains to his manager that his license was suspended after he had a diabetic episode while driving. In his deposition, however, the manager attributed Plaintiff's slowness and incoherence to his diabetes.

On October 29, 2004, the manager held a staff meeting, and Plaintiff objected that the manager was wasting people's time by covering quality assurance techniques and the importance of improving productivity. The following business day, November 1, 2004, the manager sent Plaintiff an e-mail expressing his concern that Plaintiff should interact in a positive, rather than disruptive, fashion at staff meetings.

The manager noted that Plaintiff had what were apparently diabetic episodes on September 16, 2004, October 26, 2004, January 4, 2005, and April 5, 2005. The manager personally observed the latter three episodes, noticing that Plaintiff was slow to respond and seemed incoherent.

2

On January 4, 2005, the manager sent another e-mail to a human resources employee, inquiring how to respond to Plaintiff's apparently strange behavior. The manager asked whether he should send Plaintiff for medical attention or simply encourage him to eat something and how to document the situation.

On April 12, 2005, Plaintiff informed his manager that the state had suspended his driver's license for six months. Around February 2005, Plaintiff recounted that he had had a low blood sugar episode while driving, and his vehicle ended up in a snowbank. According to Plaintiff, his role sometimes required him to drive to do repairs at other sites, and his manager indicated that they would accommodate his driving restriction by having him ride with other technicians. After that meeting on April 12, 2005, the manager and human resources personnel corresponded via e-mail. They explored the implications of how they might respond to Plaintiff's condition and the "need to be careful with this one . . . [as they would probably need to prove that they could make no reasonable accommodation] . . . ." Pl. Rs. Br., Ex. 8 [dkt #19-8]. Although Plaintiff apparently later had his driving privileges reinstated, Defendant's insurer refused to provide coverage for him as a driver again, even if he had his doctor's approval. Consequently, Plaintiff was no longer permitted to drive for work.

In May 2005, Plaintiff's medtester was sent out-of-state for repairs. (A medtester is a piece of equipment that the biomedical technicians used to ensure, *inter alia*, that electrical current flowing through a machine is safe.) During the annual calibration of Defendant's medtesters, it became apparent that Plaintiff's medtester was not properly calibrated. Further review revealed that Plaintiff had used an improperly calibrated medtester for several months. Based on readings at the time that Plaintiff took them, his manager maintains that Plaintiff should have identified those

readings as abnormally high or low.

On May 18, 2005, the manager issued a formal written warning to Plaintiff, noting performance issues, allegedly the first of Plaintiff's career. There, the manager observed Plaintiff's "questionable performance" over the prior six months, including time management, quantity of work output, technical service, and judgment calls. The action plan called for Plaintiff to complete at least 25% of internal repairs, to avoid unreasonable delays for repairs, to minimize repeat service calls and breakages of equipment during service, and to seek assistance in the face of resistance. The manager also created a log tracking repairs, and Plaintiff's output was notably lower than that of his peers. The manager also noted several instances of difficulty with Plaintiff's performance, such as (1) taking a month to repair a thermometer; (2) not repairing a piece of a equipment until seven weeks passed and until the department that used that equipment called to inquire about its status; (3) equipment failures directly after Plaintiff worked on equipment; and (4) equipment breakages while Plaintiff was working on the equipment.

On July 27, 2005, the manager received an e-mail inquiring about the status of a piece of equipment. After finding no record of receipt of that equipment or its need for repair, the manager then found that equipment on Plaintiff's workbench, still unrepaired.

That same day, the manager gave Plaintiff a performance review. He gave Plaintiff the lowest possible rating in three categories: (1) services and repairs technical electronic equipment; (2) performs preventative maintenance procedures; and (3) time management and organization. Despite noting Plaintiff's teamwork and positive approach, the manager stated that Plaintiff needed to improve his productivity and troubleshooting techniques. The manager's final review comments follow:

> At times, [Plaintiff's] knowledge and experience appears to contradict his performance. Although he almost always seems technically knowledgeable, his troubleshooting techniques often appear to be lacking in judgment and detail. His level of productivity is not high, but it is still not clear if that is related to poor time management, a slow work pace, or some other unknown problem. [Plaintiff] and I have discussed possible problems that might be a factor with some of the productivity issues, but he is reluctant to agree that his performance might be out of the ordinary. He has also been reluctant about taking on additional responsibilities such as servicing and managing audio/video systems.

*Pl. Performance Review*, Dft. Br., Ex. 9, p. 5 [dkt #17-11].

On August 6, 2005, a Saturday, Plaintiff was on-call to perform repairs for Defendant. He received a page but did not hear it. (He also missed a second page, according to a subsequent counseling action.) The person who initiated the page then contacted the manager, who made the repair himself. The manager alerted Plaintiff to the situation but indicated that they would discuss it during the workweek.

Over the next few days, the manager corresponded with human resources personnel regarding how to respond to the situation. In an e-mail from August 6, 2005, the manager wrote to human resources personnel:

> I spoke with all of you yesterday regarding [Plaintiff's] most recent episode with his diabetes. I understand that the medical issue is or can be documented and I can also refer him to counseling or FLMA [*sic*] considerations. However, I am not sure how to address the dependability side of his situation. He is currently on call and did not respond to an urgent call from radiology this Saturday morning. I called him at home and there was no explanation on why he did not hear the page except that he had the pager near his bend and he "can't do any better than that."
> This performance concern is serious. I guess my question once again is do I connect the performance issue yesterday (which is obviously directly connected to his medical condition) and today's issue with the medical problem? I need help with this because we are probably going to find ourselves either dealing with a wrongful dismissal or a serious incident involving patient care or safety.

Pl. Rs. Br., Ex. 10 [dkt #19-11]. The human resources personnel directed him to focus on Plaintiff's

job performance and to ensure that he discussed FMLA[1] options with Plaintiff.

Yet, in his deposition, the manager maintained that Plaintiff's condition did not affect the manager's perception of Plaintiff. Part of the manager's colloquy from his deposition follows:

> Q. At some point did you become concerned that his diabetic condition may be affecting his ability to perform the duties of his job?
> A. No.
> Q. Never?
> A. Never.
> Q. Did you ever ask my client if there were any medical issues that may be causing him difficulty performing his job?
> A. Specifically medical issues?
> Q. Uh-huh, yes.
> A. No.
> Q. Did you believe that he may have had medical issues that were impacting his ability to perform his job?
> A. No.

*Manager Dep.*, pp. 6-7; Pl. Rs., Ex. 3 [dkt #19-4].

On August 11, 2005, the manager placed Plaintiff on a two-month probation, via a formal counseling action. There, the manager recorded that he asked if anything was preventing Plaintiff from doing his job or if Defendant could do anything to assist in completing his duties. The manager also included Plaintiff's responses, which were in the negative; Plaintiff states in his deposition that he asked for a lamp and was provided one. The manager next wrote that he "assured [Plaintiff] that we want his job to be successful and if he feels there is a medical issue, he can contact Chris Sheets to discuss FMLA options." *Id.* at Ex. 11 [dkt #19-12].

On August 30, 2005, Plaintiff received a call to repair a machine. According to his deposition, he spent time with the caller trying to diagnose the problem, but the caller was not interested in accepting his suggestions. He states that he then tried to document the call and

---

[1] Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*

conferred with a colleague with more experience on that type of machine and regarding that type of issue. They agreed to confer with their manager upon his arrival. According to the manager's deposition, Plaintiff directed the caller to handle some of the repair and diagnostic effort, rather than going on site himself. The manager asserts that Plaintiff told the caller he would relate the situation to the manager. The manager, however, claims that he first learned of the situation when the caller contacted him separately, and the manager then responded in person. The manager states that he and Plaintiff had lunch later that day and that they discussed the technical problem at issue. After Plaintiff described to the manager how to fix the problem, the manager then told Plaintiff to do so. The manager claims that Plaintiff responded by telling him to make the repair himself, since Plaintiff had already done most of the work.

The following day, on August 31, 2005, Plaintiff had a low blood sugar episode during a visit to repair a machine on Defendant's premises. The internal client then allegedly contacted the manager to report that Plaintiff was just staring at the machine and not doing anything with it. The manager then sent another technician to the site, who repaired the machine. Next, the other technician assisted Plaintiff to another location where he had something to eat and recovered.

On September 1, 2005, the manager met with Plaintiff and terminated his employment. The manager, in the formal counseling action, stated that Plaintiff was physically unable to respond to a service request on August 30, 2005, could not perform requested service on August 31, 2005, and remained insufficiently productive on internal repairs. According to the manager, Plaintiff did not disagree with any of the reasons for the termination of his employment and did not claim that those reasons related to his diabetic condition.

On September 8, 2005, Plaintiff sent an e-mail to his manager and to a person in the human

7

resources department to request reconsideration. On September 11, 2005, he sent a letter to another person who worked for Defendant.

On October 4, 2005, the vice president of human resources for Defendant, Lynn Bruchhof, wrote to Plaintiff, declining to reinstate him after an investigation. She reiterated that he had failed to meet several performance goals after multiple counselings. She did agree to remove the August 31, 2005 incident (which involved a low blood sugar episode) from his personnel file, stating that that event would not result in any penalty to him.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

Regarding Plaintiff's claim under the ADA, 42 U.S.C. § 12112(a)[2] prohibits employment discrimination based on disability. That bar to discrimination based on disability applies to "qualified individual[s] with a disability," which is defined by 42 U.S.C. § 12111(8), in relevant part, as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this title, consideration shall be given to the employer's judgment as to what functions of a job are essential . . . .

42 U.S.C. § 12012(2) defines "disability" as follows:

> The term "disability" means, with respect to an individual –
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

A physical impairment, according to 29 C.F.R. § 1630.2(h)(1),[3] includes :

---

[2]42 U.S.C. § 12112(a) provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

[3]In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479 (1999), the Supreme Court observed that no agency had been granted authority to issue regulations interpreting the general provisions of the ADA, such as the definition of "disability." Still, the Court concluded that the parties' acceptance of the regulations as valid avoided the issue. *See also Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 n.4 (6th Cir. 2002) (noting the same issue and relying on the parties' acceptance of the regulations). No party pursues this issue so the Court will assume the validity of the regulations.

9

>Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and *endocrine* . . . .

(Emphasis added.) A "major life activity," as defined by 29 C.F.R. § 1630.2(i), "means functions such as caring for oneself, performing manual tasks,[4] walking, seeing, hearing, speaking, breathing, learning, and working."

Finally, 29 C.F.R. § 1630.2(j) defines "substantially limits" as follows:

> (1) The term substantially limits means:
> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.
> (3) With respect to the major life activity of working –
> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

"[A]n impairment is substantially limiting if it significantly restricts the duration, manner or

---

[4]The Supreme Court later provided a measure for assessing whether a limitation on "performing manual tasks" amounts to an impairment. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002) (defining that term in this context as when "an individual [has] an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and requiring the impact of that impairment to be permanent or long-term) (citation omitted).

condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity." Cmt. to 29 C.F.R. § 1630.2(j), ¶ 6.

"To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: (1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004) (citation and internal quotations omitted). If a plaintiff establishes a *prima facie* case, then the defendant may offer a legitimate, non-discriminatory reason for its employment action. *Id.* Then the plaintiff may rebut that reason by "demonstrat[ing] that the proffered reason was, in fact, a pretext for unlawful disability discrimination." *Id.* at 417-418 (citation omitted).

In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999), the Supreme Court rejected the argument that employees should be evaluated in their uncorrected or unmitigated state. Rather, employees were to be evaluated as individuals in their particular situation, including any mitigation and its effects, whether positive or negative. *Id.* By way of example, the Court suggested that a court should not find diabetics, as a class, disabled. *Id.* Instead, the focus of the inquiry should be on whether a particular diabetic's condition impairs that person's daily activities, based on the specific circumstance. *Id.*

In a case that involved a plaintiff who had diabetes, *Salim v. MGM Grand, L.L.C.*, 106 Fed. Appx. 454, 459 (6th Cir. 2004), the Sixth Circuit refused to conclude that the plaintiff was disabled where she had uncontrolled blood sugars and experienced hypoglycemic episodes in which she was

"dizzy, had difficulty breathing, and fell down." She had multiple occasions in which she had stomach cramps, heart palpitations, diarrhea, sweating, blurry vision, and leg sores. Despite those symptoms, the court concluded that the plaintiff had not demonstrated a substantial limitation on her ability to work, particularly where she could do her job (and later did a similar job) as long as she did not work at night.

Plaintiff's case, however, focuses primarily on 42 U.S.C. § 12012(2)(C), which addresses employers acting adversely based on a misperception of an employee's alleged disability. As described in *Sutton*, 527 U.S. at 489, the statue anticipates that an employer could entertain the misperception that an employee's impairment resulted in substantial limitation when the limitation, in fact, was not that great and makes the employer's conduct actionable. "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). To consider this type of ADA claim, the state of mind of the employer is at issue, and, thus, this question is rarely susceptible of resolution at the summary judgment stage. *Id*. In *Ross*, the employer described the plaintiff, who had a back injury, as the "back case" and as a "problem person," and made a notation wondering when the "problem person" could be moved to the "next step" of termination. The court concluded that the plaintiff had presented sufficient evidence that his employer's misperception of his medical status factored into the employer's decision to end his employment, so the court reversed the district court's grant of summary judgment. *Id*. at 709.

In *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516 (1999), the Supreme Court considered

a "regarded as" challenge and concluded that the plaintiff had not sustained his burden. Although the employer discharged the plaintiff because his medical condition (hypertension) arguably prevented him from having a driver's license necessary to that position, the Court still concluded that he was not perceived as substantially limited in the major life activity of working. *Id*. at 524. Although the plaintiff could not perform that particular job, his 22 years of experience in a variety of similar positions showed that the employer did not regard him as unable to perform a class of jobs. *Id*. at 524-525.

As suggested by the hypothetical example in *Sutton* and the express inclusion of endocrine disorders as a type of physical impairment under 29 C.F.R. § 1630.2(h)(1), diabetes can be a type of disability that could give rise to an action under the ADA. Here, no party contests that Plaintiff has diabetes, that Defendant knew of his condition, or that he suffered an adverse employment decision. These facts suffice for the third and fourth elements of a *prima facie* case under the ADA (an adverse employment action and the employer's knowledge), but they do not resolve whether he was disabled. As in *Sutton*, however, the remaining question in a "regarded as" case is whether the employer's assessment of an employee's condition is individualized, because the ADA does not treat particular conditions or diseases categorically.

Plaintiff has not offered evidence that his condition left him disabled, despite the fact that he did have his driver's license suspended after he lost control of his vehicle while driving. Rather, his e-mail to his manager and to human resources personnel on September 8, 2005, days after the end of his employment, articulates his belief that he can continue to contribute as a technician for Defendant. He describes several alterations, such as a different meal schedule or allowing him to punch in at different locations to avoid the uninsured driver problem, as a means of emphasizing his

ready ability to continue in his former role. Indeed, as recently as three weeks before Defendant ended his employment, Plaintiff indicated to Defendant that, apart from a lamp, he did not need any assistance in being able to fulfill his role. Based on his own description of his abilities and needs immediately before and after he was discharged, Plaintiff has supported his contention that he could perform the essential functions of his employment position, albeit possibly with some measure of accommodation.

Plaintiff argues that Defendant regarded him as disabled, under 29 U.S.C. § 12012(2)(C). Here, Plaintiff has provided some evidence that could support the inference that, over a span of time, his manager acted on his perception of Plaintiff as having a physical impairment that substantially limited him in a major life activity.

On September 24, 2004, the manager corresponded with human resources personnel to inquire how to document Plaintiff's diabetic episodes and about how he could and should respond to these episodes. The manager also maintained a chart that tracked performance concerns about Plaintiff, including times of apparent incoherence that the manager, in his deposition, linked to Plaintiff's diabetes. On January 5, 2005, the manager again corresponded with human resources personnel, inquiring how to document a diabetic episode and how best to respond. On August 6, 2005, Plaintiff missed a page when he was on-call, and his manager inquired how to document the situation, wondering whether he should "connect the performance issue yesterday (which is obviously directly connected to his medical condition) and today's issue with the medical problem." Pl. Rs. Br., Ex. 10. The manager also expressed a concern about Plaintiff's "dependability," in light of his health. On August 31, 2005, Plaintiff had a low blood sugar episode, and his manager listed Plaintiff's non-responsiveness during that circumstance as one the three reasons for the end of his

14

employment. Subsequently, on October 4, 2005, Defendant sent Plaintiff a letter stating that that low blood sugar episode did not factor into any of its decisions and that the record of that incident was stricken from his personnel file.

While a jury may reasonably believe Plaintiff's manager was responsibly seeking to accommodate Plaintiff, the Court must grant all reasonable inferences to Plaintiff. Plaintiff has offered some evidence that his manager may have erroneously relied on his perception of Plaintiff's purported disability. Most notably, the manager's e-mail of August 6, 2005 links Plaintiff's diabetes to his performance and raises a question about his dependability. At no point did Defendant seek a medical examination to review Plaintiff's ability to perform job-related functions, as permitted under 42 U.S.C. § 12112(d)(4)(B). In light of that express representation, Plaintiff has presented enough evidence that the decision to end his employment may have been based, at least in part, on his manager's allegedly erroneous perception of the effect of his diabetes on his ability to work.

Moreover, even if the foregoing did not meet a threshold demonstration that Plaintiff's manager regarded him as disabled, the manager's correspondence with human resources personnel does not reconcile with the manager's deposition testimony. In his correspondence, on more than one occasion, he referred to Plaintiff's diabetic condition and concerns that his performance was or could be compromised. In the manager's deposition, he stated – unequivocally and contradictorily – that he never became concerned that Plaintiff's diabetic condition was affecting his performance. This discrepancy between the manager's correspondence at the time and his later testimony also creates a genuine issue of material fact.

Defendant argues that the proper inquiry involves not just the existence or perception of the existence of disability, but whether Plaintiff is a "qualified individual with a disability" under 42

U.S.C. § 12111(8). Defendant contends that a variety of performance issues, such as falling behind on completing repairs and performing less work than his peers, show that Plaintiff could not "perform the essential functions of [his] employment position." While Defendant has offered evidence to support this view, that evidence is not uncontested. Plaintiff asserts that he was fulfilling his job requirements and, shortly after his employment ended, he described how he could continue to perform his role, with only minor adjustments to allow him to attend to his medical condition. Thus, despite Defendant's chronologue of Plaintiff's deficiencies, Plaintiff has demonstrated a genuine issue of material fact as to whether he could perform the functions of a biomedical technician, as required to show that he is a qualified individual with a disability.

Defendant also argues that Plaintiff has not made out one of the elements of his *prima facie* case, i.e., that he was otherwise qualified for the position. Given that Defendant had hired Plaintiff for a role that he had performed without any disciplinary action for approximately sixteen years, it seems unavailing to suggest that Plaintiff was "not qualified" for the position. Defendant's argument, however, might be better characterized as contending that Defendant had a legitimate, non-discriminatory reason for ending his employment, i.e., he could no longer fulfill his job requirements. He had failed to respond to a page, he did not attend to an on-site repair, he allegedly had fallen substantially behind in his internal repairs, and he allegedly was producing far less than his peers.

While these reasons may show that Defendant had a legitimate, non-discriminatory basis for ending his employment, Plaintiff can show adequate evidence of pretext to get him to a jury. For instance, the vice president of human resources saw fit to strike a reference to his diabetes from his termination papers after the fact. Further, his manager included Plaintiff's response during a

16

diabetic episode as one of the bases for ending his employment, so the suggestion that Plaintiff's employment was terminated only for performance reasons is directly contradicted by the manager's description of his reasons. Accordingly, the Court will deny Defendant's motion for summary judgment as to his ADA claim, because Plaintiff can establish a *prima facie* case of discrimination based on his manager's alleged perception of him as disabled and because Plaintiff can also show the existence of a pretext for Defendant's legitimate, non-discriminatory reasons for ending his employment.

B.

Regarding Plaintiff's claim under the PWDCRA, Mich. Comp. Laws § 37.1102(b) bars employment discrimination based on disability. More specifically, Mich. Comp. Laws § 37.1202(1)(b) bars employers from "[d]ischarg[ing] or otherwise discriminat[ing] against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position."

As defined in Mich. Comp. Laws § 37.1103(d), in relevant part, "disability" means one or more of the following:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.
> * * *
> (ii) A history of a determinable physical or mental characteristic described in subparagraph (i).
> (iii) Being regarded as having a determinable physical or mental

17

characteristic described in subparagraph (i).

To prove a *prima facie* case under the PWDCRA, "the plaintiff must show (1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Chiemelewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998) (citation omitted); *Peden v. City of Detroit Police Dep't*, 680 N.W.2d 857, 862 (Mich. 2004). Then the burden shifts to the defendant to respond with a legitimate, non-discriminatory reason for its employment decision. *Kerns v. Dura Mechanical Components, Inc. (On Remand)*, 618 N.W.2d 56, 62 (Mich. Ct. App. 2000).

As to perceived impairments under Mich. Comp. Laws § 37.1103(d), "[r]egardless of whether [a] plaintiff was actually disabled within the meaning of the PWDCRA, and even if [a] plaintiff no longer had any impairment at all at the time of the alleged discriminatory conduct, [a] defendant could be found to have violated [§ 1103(d)] of the PWDCRA if it discriminated against [a] plaintiff on the basis of a perceived disability." *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 408 (Mich. Ct. App. 1999). Providing evidence of a perceived impairment does not ease a plaintiff's case, because a plaintiff must still show that the employer perceived the plaintiff as disabled within the meaning of the PWDCRA. *Id*. In *Michalski v. Bar-Levav*, 625 N.W.2d 754, 760 (Mich. 2001), the Michigan Supreme Court noted that, as to cases involving either an actual disability or a perceived disability under Mich. Comp. Laws § 37.1103(d)(iii), the inquiry must focus on the alleged impairment (or perceived impairment) as of the time of the employment decision.

Although the federal case law and regulations are more developed, measures of substantial similarity exist between the ADA and the PWDCRA. *See Peden*, 680 N.W.2d at 862; *Chiles*, 606 N.W.2d at 409. Neither party has argued any meaningful difference between those jurisprudences,

so the Court will deny Defendant's motion for summary judgment on Plaintiff's PWDCRA for the same reasons as articulated above regarding his ADA claim. Plaintiff can establish a *prima facie* case that his manager regarded him as substantially limited in the major life activity of work, under Mich. Comp. Laws § 37.1103(d)(iii) & (i)(A). Although Defendant can also demonstrate a legitimate, non-discriminatory basis for ending his employment, as it can for Plaintiff's ADA claim, Plaintiff can also establish pretext here, for the same reasons outlined earlier.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #17] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 8, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 8, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS